Approved: *Samuel Raymond*
Samuel L. Raymond
Assistant United States Attorney

19MAG5209

Before: THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA           :   **SEALED COMPLAINT**

          - v. -                   :   Violations of
                                       18 U.S.C. § 1960 and 2
DANILO CHAVEZ LOZANO,              :
                                       COUNTY OF OFFENSE:
              Defendant.           :   NEW YORK

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

RYAN MONTIVERDI, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
**(Operation of an Unlicensed Money Transmitting Business)**

1. From at least in or about 2017 up to and including at least in or about 2019, in the Southern District of New York and elsewhere, DANILO CHAVEZ LOZANO, the defendant, did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, DANILO CHAVEZ LOZANO used a company he owned and controlled in Doral, Florida (the "Company") to transmit money into and through the United States, including into and through bank accounts in New York, New York, without an appropriate state license, which conduct was punishable as a felony under Florida law, and without meeting the Federal registration requirements set forth for money transmitting businesses.

(Title 18, United States Code, Sections 1960 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I am a Special Agent with the DEA, and have served in that position for approximately two years. In that capacity, I have participated in numerous investigations into money laundering, wire fraud, customs fraud, and other complex financial offenses, including unlicensed money transmitting offenses, and have personally participated in the investigation of this matter along with representatives of the DEA and the United States Attorney's Office for the Southern District of New York.

### Background

3. At all times relevant to this Complaint, DANILO CHAVEZ LOZANO, the defendant, owned and controlled the Company. The Company is based in Doral, Florida. As described herein, LOZANO has been interviewed on at least two occasions by an employee of a bank (the "Bank") where the Company maintains at least two accounts. During those interviews, LOZANO represented to the Bank employee that the Company is in the business of manufacturing and selling airplane engine equipment and/or exporting food wholesale. As more fully described below, I believe this is untrue, and the Company is actually engaged in the business of transmitting money from individuals and entities outside the United States, mostly from Uruguay, Russia, Venezuela and Panama, to bank accounts located in the United States and elsewhere that are owned by individuals and entities located both inside and outside the United States.

### Relevant Statutory Framework

4. Florida law requires anyone operating a money transmitting business to be licensed. In particular, Florida Statutes Annotated, section 560.204 provides, in part, that "[u]nless exempted, a person may not engage in . . . the activity of a money transmitter, for compensation, without first obtaining a license[.]" Florida Statutes Annotated, section 560.103, in turn, explains that a "'[m]oney transmitter' means a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer

2

within this country, or to or from this country." Under Florida Statutes Annotated, section 560.125, engaging in money transmission without the required license is punishable as a felony.

5. Based on my review of records obtained from the State of Florida, I have learned that at no point has DANILO CHAVEZ LOZANO, the defendant, or the Company been licensed to operate as a money transmitting business in Florida.

6. Under Federal law, money transmitting businesses must also be registered with the U.S. Department of Treasury. This requirement is set forth in a series of statutes and regulations more fully set forth below:

a. Title 31, United States Code, section 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury[.]" Section 5330(d)(1), in turn, explains, in part, that the "term 'money transmitting business' means . . . (A) any . . . person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g)."

b. Title 31, United States Code, Section 5313(a) provides that "[w]hen a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency . . . in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes." The term "financial institution" is defined in 31 U.S.C. § 5312(a)(2)(R) as "a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system."

3

c. Under the statutory scheme described above, the Secretary of the Treasury is given the authority to establish which individuals and entities are subject to 31 U.S.C. 5330's registration requirement. 31 U.S.C. §§ 5313(a); 5330(a)(2) & (c)(1). These regulations are contained in the Code of Federal Regulations ("CFR"). In particular, 31 C.F.R. § 1022.380(a)(1) provides that "each money services business (whether or not licensed as a money services business by any State) must register with FinCEN [an agency within the U.S. Department of Treasury] . . . . as required by 31 U.S.C. 5330[.]" 31 C.F.R. § 1010.100(ff) includes a "money transmitter" as a "money services business." The term "money transmitter" is, in turn, defined by 31 C.F.R. § 1010.100(ff)(5) to include "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. 'Any means' includes, but is not limited to . . . an informal value transfer system; or . . . [a]ny other person engaged in the transfer of funds." Accordingly, the Treasury regulations establish that any person engaged in the transfer of funds is required to register with FinCEN.

7. Financial institutions are required to conduct various monitoring and reporting activities, including the filing of currency transaction reports ("CTRs") and Suspicious Activity Reports ("SARs"). For instance, the filing of CTRs is mandated by 31 C.F.R. § 1010.311, which provides that "[e]ach financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." This regulation applies to money services businesses as defined above. 31 C.F.R. § 1022.310. Likewise, "[e]very money services business . . . shall file with the Treasury Department, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation," also known as SARs. 31 C.F.R. § 1022.320(a)(1). By failing to register with FinCEN, a money transmitting business prevents the Treasury from ensuring that the business is properly filing CTRs and SARs. This has the effect of allowing an unregistered money transmitting business to operate as a shadow bank through which funds can pass without being subjected to the scrutiny that Congress has sought fit to impose upon the United States financial system.

4

8. Based on my review of records obtained from the United States Treasury, I have learned that at no point have DANILO CHAVEZ LOZANO, the defendant, or the Company been registered with the Secretary of the Treasury or FinCEN as a money transmitting business as set forth in the statutes and regulations described above.

### The Use of Unlicensed Money Transmitters to Move Funds Into and Through the United States

9. Based on my training and experience, I have become familiar with some of the ways in which foreign-based individuals and entities seek to unlawfully and covertly move money into and through the United States. In one particularly common scheme, the individuals or entities based abroad will transfer funds to an individual or entity based in the United States who, in return for a percentage of the funds at issue, will then transfer those funds to other accounts in the United States or around the world.

10. Oftentimes, participants engage in this scheme in order to avoid currency restrictions imposed by foreign countries that make it difficult for companies and individuals to hold or transact in U.S. dollars or to make payments abroad. This is accomplished by making it seem as if the funds are destined for a business purpose in the U.S. for which the foreign government might allow transactions in U.S. dollars, when in reality, the funds are destined for United States bank accounts owned by individuals and entities unrelated to the stated business purpose. Other times, participants engage in the scheme in order to convert less stable foreign currencies into U.S. dollars, which are perceived to be more stable based on economic and social conditions around the world. Still other times, participants engage in the scheme in order to move the proceeds of criminal activity without having to send the money directly to a licensed financial institution. By partaking in the scheme, participants take advantage of the fact that the individual or entity transmitting its money in the U.S. is not an appropriately licensed banking institution, and therefore the transmission will not be subjected to the oversight that the U.S. legal system imposes on financial institutions, including the filing of CTRs and SARs.

11. For example, based on my training and experience, I am aware that the Venezuelan currency, the Bolivar, is both highly unstable and extremely difficult to officially convert to U.S. Dollars due to economic conditions as well as Venezuelan

governmental regulations. In particular, the Venezuelan government prohibits its citizen from owning or using United States dollars without government authorization. This creates an incentive for Venezuelan based individuals and entities to attempt to avoid the official conversion process that would have been required under Venezuelan law by engaging in transactions that are disguised as business payments to individuals and entities in the United States when, in reality, the money is intended for other beneficiaries in the United States or around the world.

### The Defendant Operated an Unlicensed Money Transmitting Business Through the Company

12. As detailed herein, and based on my review of records and interviews, there is probable cause to believe that between at least 2017 and 2019, DANILO CHAVEZ LOZANO, the defendant, has used the Company to effect the transmission of at least approximately $5,000,000 from individuals and entities outside the United States, mostly located in Uruguay, Russia, Venezuela or Panama, to bank accounts in the United States and elsewhere. During this time, the Company was not registered with the state of Florida or FinCEN as required by the regulations described above. Through this conduct, the Company has functioned as an unregulated financial institution allowing foreign individuals and entities to move funds into and through the U.S. without scrutiny, including being subject to the filing of SARs.

13. As part of my investigation, I have reviewed records related to the Company and to DANILO CHAVEZ LOZANO, the defendant, mostly pertaining to the time period of approximately 2017 to 2019. Among the records I have reviewed are bank records of accounts in the name of the Company and of LOZANO. From my review of these records, I have learned that during the relevant period, two accounts in the Company's name at the Bank ("Company Account-1" and "Company Account-2," and collectively, the "Company Accounts,"), both based in the United States, received millions of dollars from foreign-based individuals and entities, and then almost immediately transmitted the funds to other bank accounts held by unknown parties in the United States.

14. Among others, DANILO CHAVEZ LOZANO, the defendant, engaged in this unlicensed transmission scheme for and on behalf of the following entities and individuals:

6

Unlicensed Money Remission Through the Company Accounts

15. During the relevant period, DANILO CHAVEZ LOZANO, the defendant, used the Company to transmit funds into and within the United States on behalf of various corporations.[1]

16. DANILO CHAVEZ LOZANO, the defendant, also used the Company to transmit funds on behalf of a Venezuelan Government Entity located in Uruguay (the "VZ Entity in Uruguay") and a Venezuelan Government Entity located in Russia (the "VZ Entity in Russia"). Beginning at least as early as 2018, the Company received hundreds of thousands of dollars from the VZ Entity in Uruguay and the VZ Entity in Russia, into Company Account-1 and Company Account-2. The Company then forwarded the proceeds of funds received from the VZ Entity in Uruguay and the VZ Entity in Russia to accounts in the United States and around the world that were held in the name of, or for the benefit of, LOZANO himself, the Company, or other entities in the United States.

17. For example, on or about November 16, 2018, the VZ Entity in Moscow wired approximately $118,000 to Company Account-1. The next day, Company Account-1 wired approximately $112,000 to Company Account-2. Over the following days, money was withdrawn from Company Account-2, via check or wire, and transferred to, among others, a personal account held by DANILO

---

[1] I have reviewed bank and other records that show that the Company Accounts received approximately $518,000 from a corporation (the "Corporation"). Based on my review of open source information, it appears as if the Corporation is based in Panama. The bank records for the Company Accounts show that the Corporation sent this money from Panama through an account in New York City. For instance, on or about October 18 and October 19, 2018, Company Account-2 received approximately $245,000 in wire transfers from the account for the Corporation. Company Account-2 transferred approximately $220,000 to Company Account-1 the next day. Over the following few days, money was withdrawn from Company Account-1, via check or wire, and transferred to various entities. From my review of the names and public profiles of the recipients of the checks, I have concluded that these entities are not consistent with the stated business of the Company, airplane engine equipment or food export.

7

CHAVEZ LOZANO, the defendant, and to various other entities. From my review of the names and public profiles of the recipients of the checks, I have concluded that these entities are not consistent with the stated business of the Company, airplane engine equipment or food export.

   a.  From November 19, 2018 to November 21, 2018, the following withdrawals were made from Company Account-2: a $10,000 check written to what I believe to be a car dealership in Florida; a $100,000 check written to LOZANO himself; a $9,997 check for tires written to an unknown company; a $10,000 check written to what I believe to be a private shipping company; a $7,500 check to a private yacht company for a boat rental; a $40,000 check written to what I believe to be a lawyer or for legal services; and an $8,500 cash withdrawal.[2]

  18. Similarly, on or about December 3, 2018, the VZ Entity in Uruguay wired approximately $815,000 to Company Account-2. Over the next day, approximately $768,000 was transferred to Company Account-1. Over the next few days, the vast majority of this money was withdrawn from Company Account-1 and transferred to various entities. Once again, from my review of the names and public profiles of the recipients of the checks, I have concluded that many of these entities are not consistent with the stated business of the Company, airplane engine equipment or food export.

   a.  For instance, on December 3, 2018, an $80,000 check was written from Company Account-2 to what appears to be a real estate company in Florida, and on December 11, 2018, $200,000 was wired from Company Account-1 to the same car dealership described *infra* paragraph 15(a).

  19. In the period from September 27, 2018 to January 3, 2019, alone, the VZ Entity in Moscow and the VZ Entity in Uruguay wired more than $5,000,000 to Company Account-1 or Company Account-2, over the course of 12 transactions. Within two days of each transfer, approximately 95% of the money was

---

[2] I believe that the money withdrawn from Company Account-2 exceeds the $112,000 transferred from Company Account-1 on November 17, 2018, because the Company Accounts were also receiving other transfers around the same time and in the following days.

8

transferred to the other Company Account.[3] Within the following few days, money was then transferred to accounts held in the name of entities that are not consistent with airplane manufacturing or food export, as described above.

        20. I have also reviewed documents created by the Bank. Based on the potentially suspicious transfers, the Bank interviewed DANILO CHAVEZ LOZANO, the defendant, on two occasions. During the second interview, on October 26, 2018, a Bank employee asked LOZANO about approximately $246,000 in foreign exchange deposits previously made to the Company Accounts. LOZANO told the employee that these transfers were for the sale of heavy equipment. Soon after the meeting, however, LOZANO called the employee and told him that in fact the funds were for two charter flights that he had purchased for a client of his.

        21. Upon review, employees at the Bank determined that approximately $243,000 of the wire transfers in fact originated from the VZ Entity in Uruguay. Based on my training, experience, and participation in this investigation, I believe that LOZANO's inconsistent description of the purpose of these transfers, including his failure to identify his client as a Venezuelan Government entity, and the circumstances of foreign Government entities purportedly hiring a purported U.S.-based manufacturing company or food wholesaler to charter commercial flights, are highly suspicious indicators that the transfers were for an unlawful purpose.

---

[3] Based on my training and experience, I believe that LOZANO is keeping the other portion of the money as a fee for his money transmitting business.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of DANILO CHAVEZ LOZANO, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
RYAN MONTIVERDI
Drug Enforcement Administration

Sworn to before me this
May 31, 2019

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

10